### In re MICROSTRATEGY, INC. SECURITIES LITIGATION

#### No. CIV. A. 00–473–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 10, 2001.

Craig Crandall Reilly, Richards, McGettigan, Reilly & West, P.C., Alexandria, VA, for Plaintiffs.

Edward John Bennett, Williams & Connolly, Washington, D.C., Leo Stephen Fisher, Bean, Kinney & Korman, P.C., Arlington, VA, for Defendants.

### MEMORANDUM OPINION

ELLIS, District Judge.

At issue in this federal securities fraud class action is whether the settlement reached by the plaintiff class and the MicroStrategy Defendants[1] should be approved as fair and adequate and as meeting the requirements of Rule 23, Fed. R.Civ.P., and due process.

### I.

Only a brief summary of the consolidated complaint's allegations is required here. For a more complete discussion of these allegations, see In re MicroStrategy, Inc. Sec. Litig., 115 F.Supp.2d 620 (E.D.Va. 2000) (denying motions to dismiss).

This is a federal securities class action brought against the MicroStrategy Defendants and PwC on behalf of all persons who purchased MicroStrategy common stock or call options or sold MicroStrategy put options (collectively, "MicroStrategy Securities") during the period June 11, 1998 through March 20, 2000 (the "class period"),[2] asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and under Rule 10b–5 promulgated pursuant to the Exchange Act.[3] This action is also brought on behalf of a subclass of persons who purchased MicroStrategy stock contemporaneously with the sales of MicroStrategy stock by any of the Individual Defendants and who assert claims under Section 20A of the Exchange Act.[4]

1. Named as defendants in the consolidated class action complaint are (i) MicroStrategy, Inc. ("MicroStrategy"), (ii) certain officers of MicroStrategy ("Individual Defendants"), and (iii) MicroStrategy's auditor, PricewaterhouseCoopers ("PwC"). Defendants in categories (i) and (ii) are collectively referred to as the "MicroStrategy Defendants."

2. Excluded from the class are defendants, any person, firm, trust, corporation, or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, the partners, principals, officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns of defendants, and the immediate family members of any such individual. See In re MicroStrategy Sec. Litig., No. 00–473–A (E.D.Va. Aug. 25,

2000) (amended order regarding class certification).

3. 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b–5. By Order dated August 10, 2000, as amended on August 25, 2001, this class was conditionally certified, and Akiko and Atsukini Minami, Local 144 Pension Fund, Vera Schwartz, and Paul Schweitzer were appointed class representatives. See In re MicroStrategy Inc. Sec. Litig., No. 00–473–A (E.D.Va. Aug. 10, 2000) (Order regarding class certification); In re MicroStrategy, Inc. Sec. Litig., No. 00–473–A (E.D.Va. Aug. 25, 2000) (amended order regarding class certification).

4. 15 U.S.C. § 78t–1. The August 10 and 15 orders also conditionally certified this subclass and appointed Vera Schwartz subclass

Defendant MicroStrategy is a Delaware corporation with its principal place of business in Vienna, Virginia. Its principal product is software that facilitates the extraction and interpretation of information from large databases and that assists companies in distributing customized information to consumers through the Internet and wireless communication channels. The company also provides installation, maintenance, and consultation services to its clients.

The Individual Defendants were senior officers or directors of MicroStrategy during the class period. Michael Saylor, a co-founder of the company, was the President and Chief Executive Officer. Sanjur Bansal was the Executive Vice President and Chief Operating Officer. Mark Lynch was Vice President, Finance, Chief Financial Officer, and Principal Financial and Accounting Officer. Stephen Trundle was Senior Vice President, Technology. Ralph Terkowitz and Frank Ingari were directors of MicroStrategy.

Defendant PwC (or its predecessor Coopers & Lybrand LLP) was MicroStategy's outside accountant and auditor during 1997, 1998, 1999, and 2000. In this regard, PwC provided MicroStrategy with independent auditing and accounting services during the class period. The partial settlement at issue does not include PwC, against which plaintiffs continued to prosecute their claims under Section 10(b) of the Exchange Act and Rule 10b–5 until a separate settlement was reached in April 2001.

This action arises out of MicroStrategy's March 20, 2000 announcement that its 1998 and 1999 financial statements, which had reflected significant earnings, were in error and had to be restated, and that all of the company's previously reported earnings for those two years were, in fact, significant losses. By the market's close on Monday, March 20, 2000, the price of MicroStrategy stock had fallen precipitately, from $266.75 per share at closing on Friday, March 17, 2000, to $86.75 per share. Soon thereafter, multiple proposed class action lawsuits were filed, all focusing on alleged misrepresentations and omissions made by defendants regarding MicroStrategy's financial results and condition, as reported in the company's public filings with the Securities and Exchange Commission ("SEC") and in various press releases issued. These lawsuits were consolidated pursuant to Rule 42(a), Fed. R.Civ.P. *See In re MicroStrategy Inc., Sec. Litig.,* Civ. No. 00–473–A (E.D. Va. June 6, 2000) (order); 15 U.S.C. § 78u–4(a)(3)(B)(ii). Thereafter, plaintiffs Akiko and Atsukuni Minami and Local 144 Nursing Home Pension Fund were appointed as lead plaintiffs, and Milberg Weiss Bershad Hynes & Lerach LLP and Wolf, Haldenstein, Adler, Freeman & Hertz LLP were appointed as co-lead counsel.[5]

Distilled to its essence, the consolidated complaint alleges that during the class period, defendants caused MicroStrategy to recognize revenues improperly on software licensing agreements before those contracts were finalized and/or when they

representative. *See In re MicroStrategy Inc. Sec. Litig.,* No. 00–473–A (E.D.Va. Aug. 10, 2000) (Order regarding class certification); *In re MicroStrategy Inc. Sec. Litig.,* No. 00–473–A (E.D.Va. Aug. 25, 2000) (amended Order regarding class certification).

**5.** By Order dated June 27, 2000(i) the motion by originally appointed lead plaintiff Dominick Mazza to withdraw as lead plaintiff and to

withdraw his choice of counsel as lead counsel was approved, and (ii) Akiko and Atsukuni Minami and Local 144 Nursing Home Pension Fund were appointed as lead plaintiffs and their choice of counsel as co-lead counsel. *See In re MicroStrategy Inc. Sec. Litig.,* 110 F.Supp.2d 427, 430 (E.D.Va.2000); *see also* 15 U.S.C. § 78u–4(a)(3)(B)(i), (v).

were subject to significant contingencies. These practices, plaintiffs alleged, violated Generally Accepted Accounting Principles ("GAAP")[6] and rendered MicroStrategy's publicly released financial statements materially false and misleading throughout the class period. As a result, the complaint alleges, these public statements artificially inflated the market price of MicroStrategy securities during the class period.

On July 17, 2000, ten days after plaintiffs filed the consolidated complaint, the MicroStrategy Defendants and PwC filed respective motions to dismiss under Fed. R.Civ.P. 12(b)(6). The MicroStrategy Defendants argued, *inter alia,* that plaintiffs failed to satisfy the heightened scienter pleading requirements of the PSLRA, that the alleged misstatements and omissions were immaterial, that plaintiffs failed adequately to plead that certain of the Individual Defendants were controlling persons under Section 20(a) of the Exchange Act, and that plaintiffs failed adequately to plead the contemporaneity of any trades as among the named plaintiffs and the MicroStrategy Defendants. PwC argued that plaintiffs failed to plead scienter adequately.

Pursuant to the terms of the PSLRA, the filing of defendants' motions to dismiss stayed formal discovery in the case. *See* 15 U.S.C. § 78u–4(b)(3)(B). Nevertheless, plaintiffs continued their investigation of the underlying facts of the litigation, reviewing documents obtained from both public and private sources, conferring with consultants regarding the allegations in the consolidated complaint, and identifying, locating, and interviewing witnesses able to provide information relevant to the case. This independent investigation extended to plaintiffs' efforts to defend the consolidated complaint against defendants' threshold dismissal attacks. In this regard, plaintiffs, with the assistance of accounting and economic consultants, conducted extensive legal and factual research into the arguments raised by defendants and drafted papers in opposition to the dismissal motions. On September 15, 2000, defendants' dismissal motions, except for defendant Ingari's motion to dismiss under Section 20A of the Exchange Act, were denied. *See In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d at 666.

In August 2000, while the parties were vigorously contesting defendants' then-pending dismissal motions, counsel for the MicroStrategy Defendants broached the possibility of reaching a settlement of plaintiffs' claims against them, given their concerns over the adverse financial impact continued litigation would have on the company and the company's likely inability to pay a judgment were plaintiffs to prevail. Plaintiffs and these defendants (the "Settling Parties") thereafter engaged in extensive and intensive negotiations, which led to the adoption, on September 15, 2000, of an agreement in principle to settle and release the claims asserted against the MicroStrategy Defendants in exchange for consideration to be valued at $137.5 million. This agreement notwithstanding, however, the Settling Parties had yet to agree on the form of consideration to be exchanged, and plaintiffs' counsel made clear to the MicroStrategy Defendants that they would not proceed with a settlement unless they were convinced that the form of consideration would have an anticipated value of approximately $137.5 million.

---

**6.** Generally Accepted Accounting Principles "are the conventions, rules, and procedures that define accepted accounting practices." *United States v. Arthur Young & Co.,* 465 U.S. 805, 811 n. 7, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984).

Thus, the Settling Parties continued to confer and negotiate with respect to the form of consideration to be exchanged. These discussions, which included meetings with plaintiffs' financial advisor to discuss the details of the consideration, as well as extensive, protracted, and very difficult negotiations, culminated on October 23, 2000 with the Settling Parties entering into a Memorandum of Understanding (the "MOU") and other letter agreements with respect to the proposed settlement of plaintiffs' claims against the MicroStrategy Defendants. The MOU set forth the terms of the partial settlement, including the components of the settlement consideration, which, at the time, was valued at approximately $137 million and was comprised of (i) MicroStrategy Class A common stock valued at no less than $16.5 million, (ii) five-year notes to be issued by MicroStrategy bearing a face amount of $80.5 million with interest accruing at 7.5% and payable on a semi-annual basis, and (iii) warrants to purchase 1.9 million shares of MicroStrategy Class A common stock at an exercise price of $50 per share. Additional discovery and negotiations between the Settling Parties led to the submission to the Court of a stipulation of settlement that provides for a settlement consideration consisting of the following:

1. *Notes.* Five-year, unsecured promissory notes, with face amounts in $100 multiples, issued by MicroStrategy having a fixed, aggregate principal amount of $80.5 million bearing interest at a rate of 7.5% per annum, payable solely in cash, with interest originally accruing and compounding annually until 6 months after the date of issuance of the first notes to be issued and to be paid out on that date and, thereafter, accruing semi-annually and payable semi-annually in arrears;

2. *Settlement Shares.* At least 550,000 shares of MicroStrategy Class A common stock will be issued to the class, with an aggregate value of at least $16.5 million.[7]

3. *Warrants.* Warrants issued by MicroStrategy to purchase 1.9 million shares of MicroStrategy Class A common stock at an exercise price determined as follows: if the value of the shares prior to the date of the settlement hearing ("Trading Price") is $11 or less, then the exercise price shall be $40 per share; if the Trading Price is $24 or more, then the exercise price shall be $50 per share; if the Trading Price is between $11 and $24, then the exercise price shall be increased over $40 and up to $50 in the same proportion as the Trading Price exceeds $11 up to $24. These warrants expire five years from the date of issuance and are immediately exercisable, immediately separable from the notes, and non-redeemable. As of March 25, 2001, these warrants were valued at approximately $4.05 per warrant.

Because it is estimated that approximately 11.75 million shares of MicroStrategy Class A common stock were traded during the class period and may therefore have been damaged as a result of the wrongdoing alleged by plaintiffs ("Damaged Shares"), the estimated average gross recovery per Damaged Share will be at least $6.85 principal amount of Notes, 0.16 War-

---

7. Pursuant to the terms of the stipulation of settlement, these shares were valued according to the shares' trading price during a certain time period prior to the settlement hearing on April 2, 2001. The stipulation of settlement provides that if this trading price is less than $30 per share, then the settling defendants are obligated to issue a number of Class A common shares that, when multiplied by the trading price, will yield $16.5 million.

rants, and $1.40 worth of Class A shares. As of March 25, 2001, the settlement consideration was valued at approximately $98.5 million.[8]

According to the stipulation of settlement's plan of allocation, the gross settlement consideration, less all taxes, costs, fees, and expenses, will be distributed according to the pro rata share of members of the class and settlement subclass who submit valid and timely proofs of claim ("Authorized Claimants") as follows:

1. *Purchases of MicroStrategy common stock.* With respect to MicroStrategy common stock purchased during the class period and sold on or after March 20, 2000, the pro rata share is the difference, if a loss, between the amount paid for MicroStrategy common stock (including brokerage commissions and transaction charges), and either: (a) for shares sold between March 20, 2000 and June 19, 2000, the greater of either (i) the sum for which the shares were sold at a loss (net of brokerage commissions and transaction charges), or (ii) $43.673 [9] per share; or (b) for shares still held at the close of trading on June 19, 2000, $43.673 per share. With respect to MicroStrategy common stock purchased during the class period and sold prior to March 20, 2000, the pro rata share is 10% of the difference, if a loss, between the amount paid for MicroStrategy common stock (including brokerage commissions and transaction charges), and the

sum for which the shares wee sold at a loss (net of brokerage commissions and transaction charges). The pro rata share of Authorized Claimants who purchased MicroStrategy common stock contemporaneously with the sales of MicroStrategy common stock by the Individual Defendants are also increased by 5%.

2. *Purchases of call options on MicroStrategy common stock.* With respect to purchases of call options on MicroStrategy common stock that were open and unexpired positions of the Authorized Claimant on March 20, 2000, the pro rata share is the difference, if a loss, between (a) the amount paid for the call options on MicroStrategy common stock during the class period (including brokerage commissions and transaction charges), and (b) the greatest one of the following three amounts: (i) if the strike price of the call option was less than $86.75,[10] the amount equal to the difference between the strike price and $86.75 per share for each share covered by the option; or (ii) if the call options were sold on or after March 20, 2000, the amount for which the options were sold (net of brokerage commissions and transaction charges); or (iii) if the call options expired worthless while still owned by the Authorized Claimant, the amount of $0.00.

---

8. Of course, this figure will vary with the market over time. Also, the actual amount of settlement consideration any class member will be eligible to receive is dependent upon (i) the amount of attorneys' fees and expenses awarded from the settlement consideration and other notice and administrative costs; (ii) the number of claims actually submitted; and (iii) the price actually paid by a class member on his, her, or its purchase of shares of MicroStrategy common stock during the class period, and whether those shares were held at the end of the class period or sold during the

class period, as provided in the stipulation's plan of allocation.

9. This amount was the average closing price of MicroStrategy common stock during the 90–day period beginning on March 20, 2000 and ending on June 19, 2000.

10. This amount was the closing price of MicroStrategy common stock on March 20, 2000.

3. *Put options on MicroStrategy common stock.* With respect to put options on MicroStrategy stock, which the Authorized Claimant wrote (sold) during the class period and which were open and unexpired liabilities of the Authorized Claimant on March 20, 2000, the pro rata share is either (a) the amount paid to repurchase or cover such put options on or after March 20, 2000, less the amount received on the sale (writing) of the put option, or, (b) if the put option was exercised and assigned to the Authorized Claimant, the strike price paid for each share put to the Authorized Claimant less $86.75 per share, and less the amount received on the sale (writing) of the put option.

11. The stipulation specifically describes the Bar Order as follows:

> The Order and Final Judgment shall include a bar order pursuant to which the Court permanently bars and enjoins PwC and any other person or entity from asserting in this Court, or in any other federal court, or in any state court or other forum, any action or claim arising out of, based upon or related to any of the allegations in the Complaint or any other pleadings filed in the Action, or any claim for contribution or equitable indemnity, by which such person or entity attempts to recover losses arising out of claims made by Lead Plaintiffs or any Class member (excluding any persons or entities who timely and properly exclude themselves from the Class and Settlement Subclass), against any of the Settling Defendants or the Released Parties.

12. The subclass conditionally certified in August 2000 includes all persons or entities who, during the class period, purchased MicroStrategy common stock contemporaneously with the sales of MicroStrategy common stock by those defendants who traded contemporaneously with subclass representative Vera Schwartz, and who allegedly were damaged thereby. *See In re MicroStrategy, Inc. Sec. Litig.*, No. 00–473–A (E.D.Va. Aug. 25, 2000) (amended Order regarding class certification). For the reasons stated in the Memorandum Opinion disposing of the MicroStrategy Defendants' motion to dismiss, this

The stipulation of settlement also provides for the entry of a final judgment that includes a bar order (the "Bar Order") enjoining defendant PwC or any other person or entity from asserting claims against the settling defendants in any court based upon or related to any of the allegations of the consolidated complaint.[11]

By Order dated January 19, 2001, the Court conditionally certified a settlement subclass that is broader in scope than the original, conditionally certified subclass,[12] and directed that notice of the pendency of the action and the proposed partial settlement be disseminated to the class and certified subclass. *See In re MicroStrategy Sec. Litig.*, No. 00–473–A (E.D. Va. Jan

subclass was further narrowed to include only those who purchased MicroStrategy common stock contemporaneously with, i.e., within one day of, sales of MicroStrategy common stock by defendant Stephen S. Trundle, who traded MicroStrategy common stock on October 25, 1999, and who were damaged thereby. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d at 661–66.

The settlement subclass expands the subclass by including all members of the class who purchased MicroStrategy common stock contemporaneously with, i.e., within one day of, sales of MicroStrategy common stock by any of the Individual Defendants—that is, on one or more of the following dates: July 26, 27, 28, or 29, 1999; August 16, 17, or 18, 1999; October 21, 22, 25, 26, 27, 28, or 29, 1999; November 1, 18, 19, or 22, 1999; February 28 or 29, 2000; or March 1, 2000. Such an expansion is permissible under the circumstances, as all the requirements of Rule 23—namely, numerosity, commonality, typicality, adequacy, and predominance of common legal and factual questions—are satisfied. *See Sanders v. Robinson Humphrey/American Express, Inc.*, 634 F.Supp. 1048, 1057 (N.D.Ga.1986) ("When Plaintiffs have alleged a common course of conduct, courts consistently have found no bar to class certification even though members of a class may have purchased different types of securities or interests, or purchased similar securities at different times.").

19, 2001) (consent order directing notice to the class and subclass). Dissemination of such notice commenced on January 26, 2001 and has now been completed.[13] Accordingly, the task at hand is to determine (i) whether the proposed partial settlement should be approved as fair and adequate; (ii) whether the proposed plan of allocation should be approved as fair and adequate; (iii) whether the Bar Order is appropriate in the circumstances of this case; and (iv) whether the notice sent to the class and subclass comports with the requirements of due process.

## II.

■ A significant feature of the settlement consideration is that it includes no cash; it is composed entirely of the company's notes, stocks, and warrants. Although this settlement is unusual in this respect, it is not unprecedented; courts in appropriate circumstances have approved settlements of securities class actions in which notes, common stock, warrants, or other forms of non-cash consideration comprised all or a substantial part of the settlement consideration.[14] As in all instances of non-cash settlements, the settlement here merits particularly close scrutiny to determine whether it represents a verifiably fair and adequate settlement of plaintiffs' claims against the MicroStrategy Defendants. In the end, a review of the marketability and liquidity of all components of the settlement consideration, and of the circumstances that necessitated a non-cash settlement of plaintiffs' claims, compels the conclusion that the non-cash character of the partial settlement should be no bar to court approval.

To begin with, it is clear from the record that the prospects for a cash recovery—whether through settlement of plaintiffs' claims against the MicroStrategy Defendants or through a judgment—must be evaluated as slim, given MicroStrategy's current weakened financial condition. According to the analysis of Wilbur Ross, Jr., plaintiffs' financial analyst, MicroStrategy has been operating since inception at a considerable negative cash flow and is forecasted to do so through at least December 2001. As of June 30, 2000, moreover, MicroStrategy only had cash and equivalents of $128.6 million, even accounting for a $125 million convertible preferred stock issue. In this regard, it would be unreasonable to expect MicroStrategy to sustain a cash outlay approximating the value, or any significant portion, of the settlement consideration. The MicroStrategy Defendants likely would not have agreed to the partial settlement if the company's limited cash holdings had to be used to fund the settlement consideration, as such an expenditure would have significantly threatened MicroStrategy's already fragile existence.

Second, all of the components of the settlement consideration are immediately marketable; they may be immediately converted into cash or held as an investment.

---

13. Ultimately, more than 57,000 copies of the notice and accompanying proof of claim form were distributed. *See* Washington Aff. ¶¶ 3–8.

14. *See, e.g., Berke v. Presstek, Inc.,* No. 96–347 (MDL No. 1140), slip op. (D.N.H. June 26, 2000) (approving non-cash settlement consideration consisting of $22 million in stock); *In re Cendant Corp. Prides Litig.,* 51 F.Supp.2d 537, 540–41 (D.N.J.1999) (approving noncash settlement consideration consisting of convertible stock "Rights"); *see also In re*

*Prison Realty Sec. Litig.,* Nos. 3:99–0458, slip op. (M.D.Tenn. Feb. 12, 2001) (approving settlement consideration consisting of stock and cash valued together at approximately $105 million); *In re Informix Corp. Sec. Litig.,* Master File No. C 97–1289, slip op. (N.D.Cal. Nov. 9, 1999) (approving settlement consideration consisting of $49 million in cash and more than 8.6 million shares of stock valued at $87.5 million).

The $80.5 million in notes will yield immediate interest of 7.5%, to be accrued and paid semiannually and retroactively from April 2, 2001, the date of the settlement hearing. These notes, moreover, will be freely marketable in a secondary market and payable in full within five years of issuance. The company is also to issue common shares of an immediate $16.5 million value that are marketable. Finally, the 1.9 million warrants to be issued by MicroStrategy will also be marketable in a secondary market and outstanding for five years. Thus, a guaranteed minimum value will be received by each class member.[15]

Accordingly, the non-cash character of the settlement consideration represents, in the circumstances of this case, a reasonable method for securing value for plaintiffs' settlement of their claims against the MicroStrategy Defendants. Clearly, the components of the settlement consideration in this case, given the company's fragile financial state, represent an instance where "the parties' expertise and comparative freedom in crafting a remedy promise a more sensible and practical resolution to the problems presented by this complex litigation than that likely to result from judicial intervention." *American Canoe Ass'n v. EPA,* 54 F.Supp.2d 621, 625 (E.D.Va.1999).

### III.

▇ Rule 23(e) provides that a class action "shall not be ... compromised with-

out approval of the [district] court ...." Fed.R.Civ.P. 23(e). To this end, "the role of a court reviewing the proposed settlement of a class action under Fed.R.Civ.P. 23(e) is to assure that the procedures followed meet the requirements of the Rule and comport with due process and to examine the settlement for fairness and adequacy."[16] Ultimately, approval of a class action settlement is committed to "the sound discretion of the district courts to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in light of the relevant circumstances." *Evans v. Jeff D.,* 475 U.S. 717, 742, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). However, "there is a strong initial presumption that the compromise is fair and reasonable." *South Carolina Nat'l Bank v. Stone,* 139 F.R.D. 335, 339 (D.S.C.1991).

The Fourth Circuit's decision in *In re Jiffy Lube Sec. Litig.,* 927 F.2d 155, 158 (4th Cir.1991), provides clear guidance on the nature of the inquiry required to determine whether the settlement at bar should be approved. There, the Fourth Circuit adopted a bifurcated analysis, separating the inquiry into a settlement's "fairness" from the inquiry into a settlement's "adequacy." *See id.* at 158–59. Accordingly, each inquiry will be separately made in turn.

### A. *Fairness*

▇ A court assessing the fairness of a proposed settlement must consider the fol-

---

15. Significantly, plaintiffs' counsel demonstrate their confidence in the securities nature of the settlement by seeking to be paid their fees and expenses out of the same settlement consideration to be received by the class in the same proportions as will be received by each class member, and also waiting to receive any such fees or expenses until the class receives its distribution. *See In re Brown Co. Sec. Litig.,* 355 F.Supp. 574, 593 (S.D.N.Y. 1973) (requiring counsel to accept *part* of their fees in-kind "because they have ex-

pressed faith and confidence in the value of the settlement for their clients").

16. *Vaughns v. Board of Educ. of Prince George's County,* 18 F.Supp.2d 569, 578 (D.Md.1998); *see also* Manual for Complex Litigation (Third) § 30.42 (1995) ("[T]he court must decide whether it is fair, reasonable, and adequate under the circumstances and whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued.").

lowing four factors: "(1) the posture of the case at the time the settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of securities class action litigation." *In re Jiffy Lube,* 927 F.2d at 159. These factors, applied to the circumstances of this case, point persuasively to the conclusion that the partial settlement is fair.

First, although the partial settlement was reached relatively early in the litigation, it was reached only after the Settling Parties vigorously contested a motion to dismiss brought by the MicroStrategy Defendants. This motion was denied in all material respects and in favor of plaintiffs for the reasons set forth in a 78–page Memorandum Opinion dated September 15, 2000. *See In re MicroStrategy Sec. Litig.,* 115 F.Supp.2d 620 (E.D.Va.2000). Moreover, the partial settlement was finally ratified only after the MicroStrategy Defendants answered the consolidated complaint and the parties engaged in significant discovery,[17] which clarified plaintiffs' previous understanding of the strength and weaknesses of their claims and afforded plaintiffs the ability to confirm the fairness, reasonableness, and adequacy of the proposed partial settlement.[18] Indeed, the MOU provided that, in the event discovery revealed that the terms of the proposed partial settlement were not fair, reasonable, or adequate, plaintiffs would have a right to terminate the proposed partial settlement and resume the litigation, with the parties reverting to their positions immediately prior to the execution of the MOU. In this regard, the posture of this case at the time the partial settlement was reached raises no concern that the settlement was reached in bad faith, was not the result of arm's length bargaining, or was a product of collusion among the Settling Parties.[19] And, although this settlement came early on— prior to the completion of formal discovery—it is clear that plaintiffs "have conducted sufficient informal discovery and

---

**17.** A letter agreement between the Settling Parties that formed part of the documentation relating to the October 23, 2000 MOU secured the MicroStrategy Defendants' commitment to provide plaintiffs with comprehensive document production and witness interviews, including those relating to plaintiffs' then-continuing litigation against PwC, without the need for non-party subpoenas and other procedures. Pursuant to this agreement, the MicroStrategy Defendants produced, *inter alia,* financial documents, draft and final contracts, and internal correspondence between MicroStrategy employees and its customers and, significantly, its auditor relating to contract terms and contract accounting treatments. Thus, plaintiffs' counsel inspected hundreds of thousands of pages of documents, in addition to conducting interviews and depositions of MicroStrategy directors, officers, and employees and working extensively with accounting and damages experts and other consultants.

**18.** *See Horton v. Merrill Lynch, Pierce, Fenner & Smith,* 855 F.Supp. 825, 830 (E.D.N.C.

1994) (finding that "the discovery conducted by class counsel, although not all-encompassing, was sufficient to allow counsel and the court to evaluate the limited class claims"); *In re Austrian and German Bank Holocaust Litig.,* 80 F.Supp.2d 164, 176 (S.D.N.Y.2000) (noting that "[t]o approve a proposed settlement, the Court need not find that the parties have engaged in extensive discovery"; rather, "it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make ... an appraisal' of the Settlement") (quoting *Plummer v. Chemical Bank,* 668 F.2d 654, 660 (2d Cir.1982)).

**19.** *See South Carolina Nat'l Bank,* 139 F.R.D. at 339 (finding that the proposed settlements were entered into in good faith, at arm's length, and without any collusion, where defendants had answered the complaint and all motions to dismiss had been ruled upon at the time of these settlements).

investigation to ... evaluate [fairly] the merits of Defendants' positions during settlement negotiations." *Strang v. JHM Mortgage Sec. L.P.,* 890 F.Supp. 499, 501 (E.D.Va.1995).

Second, the partial settlement resulted from arm's length negotiations conducted by counsel with the "experience and ability ... necessary to effective representation of the class's interests." *Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir. 1982). Counsel for both sides of this lawsuit participated in numerous meetings and extensive and intensive discussions extending over a period of months, with plaintiffs' lead counsel pressing their belief in the strength of their case on the merits. Indeed, that counsel for both sides are nationally recognized members of the securities litigation bar further minimizes concerns that the Settling Parties colluded to the detriment of the class's interests. *See In re MicroStrategy Sec. Litig.,* 110 F.Supp.2d at 440 (noting that "[i]t is undisputed that both firms are competent and experienced in class action securities fraud litigation and that both have the resources to serve effectively as co-lead counsel"). In these circumstances, it is "appropriate for the court to give significant weight to the judgment of class counsel that the proposed settlement is in the interest of their clients and the class as a whole," and to find that the proposed partial settlement is fair.[20]

## B. Adequacy

■ *Jiffy Lube* teaches that the adequacy inquiry is guided by evaluating

(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.

*Jiffy Lube,* 927 F.2d at 159. These factors, applied here, compel the conclusion that the partial settlement also merits court approval as adequate

First, it is clear that, while plaintiffs' counsel express confidence in the strength of plaintiffs' case on the merits, "the complexities and uncertainties characteristic of class action securities litigation, and the associated expenses of such litigation, make it appropriate for ... plaintiffs to compromise their claims pursuant to a reasonable settlement." *South Carolina Nat'l Bank,* 139 F.R.D. at 340; *see also West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 743–44 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir.1971). In this case, a fair assessment of plaintiffs' burden of establishing the elements of their fraud claim against the asserted defenses of the MicroStrategy Defendants on liability and damages grounds firmly supports the propriety of the partial settlement.

To prevail on their Section 10(b) claim against the MicroStrategy Defendants, plaintiffs must prove, *inter alia,* that the MicroStrategy Defendants were responsible for material misstatements or omissions of fact; that these defendants know-

---

**20.** *South Carolina Nat'l Bank,* 139 F.R.D. at 339; *see also Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir.1975) ("While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement."); *Cotton v.*

*Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977) ("[T]he trial court is entitled to rely upon the judgment of experienced counsel for the parties. Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.").

ingly or recklessly misstated or omitted the alleged material facts; that the class justifiably relied upon the misrepresentations; and that the class suffered damages as a result of this misconduct. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 387–91, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d at 628. To be sure, this is a heavy burden, for it is always true that "[p]laintiffs' risks of establishing liability are significant where fraud is alleged. Elements such as scienter, materiality of misrepresentation and reliance by the class members often present significant barriers to recovery in securities fraud litigation." *In re GNC Shareholder Litig.,* 668 F.Supp. 450, 451 (W.D.Pa.1987). In this regard, although plaintiffs successfully defended a threshold dismissal motion by the MicroStrategy Defendants, success at trial is another matter entirely. Victory at the threshold does not necessarily forecast victory on the merits.

Plaintiffs' difficulty in establishing the merits of their claim would have been exacerbated by defenses to liability and damages that the MicroStrategy Defendants could have been expected to muster. For example, plaintiffs' burden of proving that the MicroStrategy Defendants acted with scienter would have been particularly heavy given that the MicroStrategy Defendants would likely have argued that they continually and reasonably relied on the advice of their outside auditor, defendant PwC, with regard to the accounting treat-

ment accorded MicroStrategy's contracts. Some courts have recognized such "good faith reliance" on the advice of an accountant as a viable defense to scienter in securities fraud cases.[21] Here, the MicroStrategy Defendants likely would have argued that they purposefully engaged PwC, a well-known and respected firm, to review and/or approve the terms of relevant contracts and to approve the proposed accounting treatment for those contracts, and that, in this regard, they relied upon PwC to ensure that the accounting treatment was in accordance with GAAP. The appeal and plausibility of this defense amplifies the uncertainty of plaintiffs prevailing on the merits of their fraud claims. Indeed, a claim made by the MicroStrategy Defendants that PwC is chiefly responsible for the misrepresentations implicates the proportionate liability scheme of the PSLRA and thereby might have reduced the amount of damages recoverable from the MicroStrategy Defendants. *See* 15 U.S.C. § 78u–4 (providing that "a covered person against whom a final judgment is entered in a private action shall be liable solely for the portion of the judgment that corresponds to the percentage of responsibility of that covered person").

Beyond this, plaintiffs would likely have faced a challenge from the MicroStrategy Defendants on damages. Specifically, the MicroStrategy Defendants' experts likely would have challenged plaintiffs' estimated maximum recoverable damages of $711 million[22] and argued that the company's

---

**21.** *See, e.g., SEC v. Caserta,* 75 F.Supp.2d 79, 94 (E.D.N.Y.1999); *Newton v. Uniwest Fin. Corp.,* 802 F.Supp. 361, 367–68 (D.Nev. 1990 ), *aff'd,* 967 F.2d 340 (9th Cir.1992); *cf. U.S. v. Schmidt,* 935 F.2d 1440, 1449 (4th Cir.1991) (noting that "the essential elements of a reliance defense are 1) full disclosure of all pertinent facts to an expert and 2) good faith reliance on the expert's advice").

**22.** It is worth noting that the amount to be recovered under the partial settlement, which, at the time it was negotiated, was valued at approximately $137.5 million and, as of April 2001, was estimated to be worth approximately $100 million, compares favorably to amounts recovered in similar cases. *See, e.g., Orman v. America Online, Inc.,* Civ. A. No. 97–264–A (E.D.Va. Dec. 14, 1998) (order approving settlement amounting to approxi-

stock price movement during the class period could be explained as being caused, in whole or in part, by factors other than alleged artificial inflation—from market forces or conditions generic to the overall industry, for example. In this regard, the damages issue would have become "a battle of experts at trial, with no guarantee of the outcome in the eyes of the jury." *In re Ames Dep't Stores Inc. Debenture Litig.*, 150 F.R.D. 46, 54 (S.D.N.Y.1993). These risks, inherent in the divergent expert testimony reasonably anticipated in a case of this sort, further support the adequacy of the partial settlement.

Second, additional litigation of plaintiffs' claims against the MicroStrategy Defendants would likely have been protracted and costly, requiring extensive expert testimony concerning the company's accounting practices and the significance of the Individual Defendants' decisions in relation to GAAP. Nor is it likely that this litigation would have ended with a jury verdict; there is little doubt that a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying

any relief for plaintiffs. *See In re Baldwin–United Corp.*, 607 F.Supp. 1312, 1320–21 (S.D.N.Y.1985) ("[T]he risk of appeal is not confined merely to expense and delay; an adverse ruling upon appeal could overturn whatever recovery plaintiffs might obtain at trial."). And, even were plaintiffs ultimately to recover damages of up to $711 million, it is highly unlikely that such a judgment would be collectible. More likely, were this to occur, is that the company would be forced to file for bankruptcy, thereby leaving plaintiffs with nothing but a massive, unsecured claim against the company that might well lead to little or no recovery.[23] *See South Carolina Nat'l Bank*, 139 F.R.D. at 341. Thus, the old adage, "a bird in hand is worth two in the bush" applies with particular force in this case.[24]

Finally, it is quite significant that, although more than 57,000 members of the class were sent the notice and proof of claim, no member of the class filed and pursued an objection. Only one class member timely objected to the partial settlement, and this sole objector thereafter withdrew his objection, noting that he was "satisfied that the settlement is fair and adequate." [25] Such a lack of opposition to

mately 5% of the maximum recovery); *In re Newbridge Networks Sec. Litig.*, Civ. A. No. 94–1678, Fed. Sec. L. Rep. (CCH) ¶ 90,319, 1998 WL 765724 (D.D.C. Oct. 23, 1998) (approving settlement that constituted "between six and twelve percent of the recovery that the class potentially could secure were it to win a judgment at trial"); *In re Baesa Sec. Litig.*, 969 F.Supp. 238 (S.D.N.Y.1997) (approving settlement amounting to a recovery of 16% of potential recovery); *In re Crazy Eddie Sec. Litig.*, 824 F.Supp. 320, 323–24 (E.D.N.Y.1993) (approving recovery of approximately 10% of potential recovery).

23. It should also be noted that the decline in MicroStrategy's stock price also limited the Individual Defendants' ability to pay a multimillion dollar judgment.

24. *See Cardiology Associates, P.C. v. National Intergroup, Inc.*, 1987 WL 7030, at *2 (S.D.N.Y.1987) (concluding that because continued prosecution of the action would have been expensive and time-consuming, and would have involved substantial risks, "it [was] not unreasonable for the plaintiff class to take a 'bird in the hand' "); *Alvarado Partners, L.P. v. Mehta*, 723 F.Supp. 540, 547 (D.Colo.1989) (noting that "[i]t has been held prudent to take 'a bird in the hand instead of a prospective flock in the bush' " in weighing the value of an immediate recovery against "the mere possibility of future relief after protracted and expensive litigation") (quoting *Chas. Pfizer & Co.*, 314 F.Supp. at 740).

25. This sole objector, Samuel Rothman, argued that the settlement consideration cannot presently be valued and that, therefore, it is

the partial settlement strongly supports a finding of adequacy, for "[t]he attitude of the members of the Class, as expressed directly or by failure to object, after notice to the settlement is a proper consideration for the trial court." *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir.1975). A finding of adequacy here is also bolstered by the fact that only seven class members have chosen to opt-out of the case in response to the notice. *See Strang* 890 F.Supp. at 502 (finding that "the class response supports settlement—not a single class member has objected to the Settlement Agreement and only a small number have opted-out"). Because "the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy," the lack here of any objections to the partial settlement and the small number of class members choosing to opt-out of the case strongly compel a finding of adequacy. *Sala v. National R.R. Passenger Corp.*, 721 F.Supp. 80, 83 (E.D.Pa.1989).

## IV.

█ To warrant approval, the plan of allocation must also meet the standards by which the partial settlement was scrutinized—namely, it must be fair and adequate. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284–85 (9th Cir. 1992); *In re Oracle Sec. Litig.*, 1994 WL 502054, at *1 (N.D.Cal. June 18, 1994). Application of these principles to the plan of allocation compels to the conclusion that the plan of allocation should also be approved as fair and reasonable.

█ The plan of allocation generally treats all class members' losses in the same way, as each Authorized Claimant will receive a pro rata share of the settle-

ment consideration (less certain fees and expenses), as determined by the ratio that the Authorized Claimant's allowed claim bears to the total allowed claims of all authorized claimants. There are, however, three exceptions to this general allocation scheme that bear noting.

First, the plan of allocation provides a recovery, albeit at a significant discount, to those who purchased MicroStrategy shares during the class period, but sold those shares prior to the end of the class period. Specifically, the plan of allocation awards such "in-and-out traders" 10% of any loss they sustained through the purchase of MicroStrategy common stock. Although under plaintiffs' theory of the case a correction of defendants' alleged fraud did not occur until March 20, 2000, and these traders therefore did not suffer damages by selling their shares before the correction, the plan of allocation's award of a discounted recovery recognizes the possibility that these traders were damaged by certain disclosures made prior to March 20, 2000. Thus, the plan of allocation acknowledges that these traders have weaker claims than do other class members and that these traders' damages claims are susceptible to attack from the MicroStrategy Defendants; nonetheless, the plan appropriately seeks to compensate them for the far lesser damages they potentially sustained because of the MicroStrategy Defendants' alleged fraud.

Second, the plan of allocation also gives members of the subclass a 5% premium on their recovery in recognition of the additional Section 20A claims that subclass members may have in addition to their Section 10(b) claims. In this regard, the plan of allocation recognizes that these

---

premature to consider the fairness of the partial settlement or the fee request. It is clear, however, that the settlement consideration

can be reliably valued employing widely used economic analyses.

subclass members' prospects for recovery are relatively stronger than other class members' prospects because of their additional Section 20A claims and accordingly gives them an appropriately modest premium. *See Rubenstein v. Republic Nat'l Life Ins. Co.*, 74 F.R.D. 337, 349 (N.D.Tex. 1976) (noting that "differences [in] the underlying basis for claim" may be "sufficient basis to distinguish between ... classes in the manner in which the distinction appears in the results and the benefits to the classes"), *aff'd sub nom., Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426 (5th Cir.1977).

Third, the plan of allocation provides for a recovery for those who purchased call options on MicroStrategy common stock that were open and unexpired as of the end of the class period, and for sellers of put options during the class period that were open and unexpired liabilities as of the end of the class period, based on the extent of such class members' losses. As such, the plan of allocation acknowledges that purchasers and sellers of options open on March 20, 2000 have strong claims, similar to the claims of common stock purchasers, that can be measured against the drop in the stock price.[26]

In sum, the plan of allocation, as a general matter, fairly treats class members by awarding a pro rata share to every Authorized Claimant, but also sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue. *See Rubenstein*, 74 F.R.D. at 349. As such, the plan fairly and rationally allocates the settlement consideration among class members and accordingly should be approved as fair and reasonable.

**V.**

■ The question whether a bar order is appropriate in these circumstances is unambiguously answered by the PSLRA, which explicitly eliminates all claims for contribution brought against any settling defendant and provides for the implementation of a bar order by the court, discharging all of a settling defendant's obligations to any non-settling person or party "arising out of the action." 15 U.S.C. § 78u–4(f)(7)(A); *see Neuberger v. Shapiro*, 110 F.Supp.2d 373, 381 (E.D.Pa. 2000). For these reasons, and because, as a practical matter, "settlement often may be impossible without an effective and comprehensive Bar Order," the stipulation of settlement's bar order provision should be approved. *U.S. Fid. & Guar. Co. v. Patriot's Point Dev. Auth.*, 788 F.Supp. 880, 882 (D.S.C.1992).

**VI.**

■ Finally, it is also clear that the mail and publication notice program undertaken in this case was tailored to reach as many members of the class as practicable and therefore meets the due process requirements of Rule 23. Over 57,000 copies of the notice were mailed directly to potential class members and to banks, brokers, and nominees for forwarding to members of

---

**26.** Under the plan of allocation, claims by traders in MicroStrategy options are treated differently than purchasers of common stock in two respects. First, because the use of the time value of options for the 90 days following March 20, 2000 would distort the amount of loss that could be attributed to the alleged misrepresentation, the loss for an options trader is measured against the March 20, 2000 drop, rather than against the average for the 90–day period following the disclosure. Second, no claim is recognized for in-and-out transactions because such transactions would be subject to defenses both with respect to the consistency in inflation on the opening and closing dates, and to the difficulty in attributing in-and-out losses to any artificial inflation rather than differences in time premiums.

the class. In addition, a summary notice was published in several publications, including *The Wall Street Journal, USA Today,* and *The New York Times,* and the relevant documents were made available through the clerk's office and posted in full on websites maintained by each of the co-lead counsel. Thus, the notice program undertaken here constitutes "the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin* 417 U.S. 156, 175, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

Moreover, the content of the notice sent was also clearly sufficient. The notice sent in this case: (i) identified members of the class and subclass and the affected securities; (ii) included a lengthy description of the proceedings, the terms of the partial settlement, and the plan of allocation; (iii) stated the maximum amount of plaintiffs' counsel's request for an award of attorneys' fees (33 1/3%), as well as the maximum amount of plaintiffs' counsel's request for reimbursement of expenses ($1.25 million); (iv) explained the rights of members of the class to request exclusion or to appear and object and explains the procedures for doing so; (v) detailed who is entitled to participate in the partial settlement; and (vi) notified those class members who wish to appear of the time and place of the hearing on the partial settlement. In addition, the notice (i) estimated the value of the partial settlement proposed to be distributed to the class and subclass members, set forth in both the aggregate and on a per share basis; (ii) provided a statement of the parties' disagreement as to the potential damages recoverable in the case; (iii) provided a statement as to the amount of the requested attorneys' fees sought by plaintiffs' counsel on a per share basis; (iv) provided the identity, address, and phone numbers of plaintiffs' counsel for the purposes of obtaining additional information and answering questions; (v) and provided a brief statement explaining the reasons why the parties are proposing the partial settlement. In this regard, the notice has more than adequately "apprise[d] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them." *Maher v. Zapata Corp.,* 714 F.2d 436, 451 (5th Cir.1983).

## VII.

For the foregoing reasons: (1) the partial settlement and the plan of allocation of the partial settlement are fair, adequate, and reasonable, meet the requirements of Rule 23, and thus merit approval; (2) the Bar Order of the partial settlement should be approved; and (3) the subclass as defined in the stipulation should be finally certified.

An appropriate Order has been issued.